HUTSON v. LONG BELL LUMBER CO. et al.

CARSON v. SAME.

Nos. 1832, 1841.

District Court, W. D. Missouri, W. D.
Oct. 15, 1932.

John S. Leahy and Walter H. Saunders (of Leahy, Saunders & Walthers), both of St. Louis, Mo., and Floyd E. Jacobs, and M. J. Henderson (of Jacobs & Henderson), John T. Barker, Charles P. Woodbury, Phineas Rosenberg, David M. Proctor, and Charles C. Madison, all of Kansas City, Mo., for complainants.

Jesse Andrews, R. R. Brewster, Cornelius E. Lombardi, Flavel Robertson, and David E. McLean, all of Kansas City, Mo., for defendants.

OTIS, District Judge.

In the answer filed in each of these consolidated cases is contained the following paragraph: "For a further, separate and distinct defense in point of law arising upon the face of the said amended bill of complaint herein, these defendants say that the facts alleged in said amended bill of complaint are insufficient to constitute a valid cause of action in equity."

The issue thus made, considered as equivalent to a motion to dismiss, has been presented and submitted upon oral and written argument, and is now for decision.

As to each of the two bills, defendants contend that it does not state facts sufficient to constitute a valid cause of action in equity for that—

I. The complainant is a simple contract creditor so far as the contract securing the payment of the bonds held by complainant, and, being such, is not entitled to have a receiver appointed of any of the unmortgaged assets of the defendants.

II. The complainant, being a simple contract creditor, cannot maintain a suit in equity to set aside the transfer of assets from the Long Bell Lumber Company to the Long Bell Lumber Sales Corporation even if that transfer was fraudulent.

III. The complainant cannot maintain an action against officers of a corporation to compel an accounting, because he is a simple contract creditor whose claim has not been reduced to judgment.

IV. The complainant is not entitled to the appointment of a receiver as to property covered by the mortgage securing the payment of the bonds held by the complainant, for the reason that such mortgaged property is not located within the Western district of Missouri.

The bills are essentially identical. One only will be considered. What is said as to

that and the motion to dismiss it will apply with equal force to the companion bill.

As a preliminary to the consideration of the motion, it is necessary to set out precisely what the bill alleges as to the complainant's connection with the business of the defendants by reason of which connection he claims a right to the relief sought by him.

In case No. 1832 the complainant alleges that he owns five mortgage bonds of the Long Bell Lumber Company, "all of the said above described bonds being secured by direct first mortgage on the unincumbered standing timber of said defendant, The Long Bell Lumber Company, and all plants, mills and property of the said defendant company hereinafter referred to, which said mortgaged property is located in the states of Louisiana, Texas, California, Oregon, Washington and other states."

Something of the history of the Long Bell Lumber Company is then recited, and it is alleged that that company had built up a valuable good will, the continued existence of which depends upon the continuity of its business activities, and that such good will "is of immense importance to the complainant." The nature of the business of the company is then described and the relationship of the several defendants with it. It is alleged that in October, 1930, the Long Bell Lumber Company transferred "certain asserts of that company" to the Long Bell Lumber Sales Corporation. Follow allegations touching a certain "syndicate loan agreement" entered into by the Long Bell Lumber Sales Corporation and with certain banks and the guaranty by the Long Bell Lumber Company of loans made by such banks to the Long Bell Lumber Sales Corporation. It is alleged that the value of assets conveyed to the Long Bell Lumber Sales Corporation, less liabilities assumed, resulted in a paid-in surplus for the sales corporation of $10,793,336.60. It is alleged that this transfer of assets was illegal and fraudulent, and that "the direct effect thereof (has) been and will be to deplete, dissipate and waste the assets of the said The Long Bell Lumber Corporation without any consideration therefor, to the injury, prejudice and detriment of the complainant. * * * "

Follow allegations of the interdependency of the defendant corporations and that the property and assets of each constitute and are part of the property and assets of the defendant, the Long Bell Lumber Corporation, and that such property and assets are located in Jackson county, Mo., and various counties in other states. The secured indebtedness (evidenced by bonds) of the defendant, the Long Bell Lumber Company, is then described, the amounts thereof, and other indebtedness, as well as the indebtedness of certain of the subsidiaries of that company guaranteed by it. It is then alleged: "That said bonds were purchased by the purchasers thereof, including this complainant, upon the faith of the assets of The Long Bell Lumber Company shown in the circulars of the bankers and brokers, issued in connection with and in the name of the said Long Bell Lumber Company and as an aid to the sale of said bonds to the general public; and upon the faith of these statements in the said circulars that the said Long Bell Lumber Company had for many years been a going and prosperous business and was operating as a complete industrial unit and was so in fact, the said bond purchasers, including this complainant, believing said statement and further believing that the said The Long Bell Lumber Company would continue in business as a complete industrial unit, purchased the said bonds. That the said transfer herein pleaded, destroyed the continuity of said business, dismembered the said industrial unit and terminated the same and thereby damaged said plaintiff. * * * "

Follow allegations that the officers and directors of the Long Bell Lumber Company organized the Long Bell Lumber Sales Corporation and transferred to it "all of the free, unpledged and unincumbered assets of said company and its subsidiaries, approximately $27,000,000 in value; * * * that by said transfer the said The Long Bell Lumber Company stripped itself of all of its available free, unpledged and unincumbered assets, to the detriment and prejudice of its secured and unsecured creditors." And it is further alleged that this transfer was illegal and that in making it the officers and directors of the Long Bell Lumber Company were guilty of a breach and abuse of trust and of a fraud upon the bondholders to their injury and detriment. It is alleged that this transfer of assets and the plan and scheme in connection with which it was made destroyed the credit of the Long Bell Lumber Company necessary to enable it to carry on continued operations, and that what has been done "has so depreciated the value and assets of the said lumber company and of its subsidiaries that it has greatly impaired the securities of the said complainant and of other bondholders, and that if said plan and scheme remains unquestioned, the said se-

curities of said complainant and of other bondholders will be so depreciated that they will lose a large proportion of their said investment."

Other matters are then alleged which it is charged will result in detriment to the complainant and lessen the value of the bonds owned by him, including overexpenditure for operating expenses by the officers and directors of the Long Bell Lumber Company, on account of all of which it is alleged that the business of the defendant should be taken over by the court and operated by it through receivers.

It is not alleged that the Long Bell Lumber Company is insolvent, that it does not still possess and own all of the properties covered by the mortgage, or that any of those properties have been wasted or have suffered depreciation through any act of mismanagement.

This brief summary of the allegations of the bill may be epitomized as follows: The complainant is a secured creditor of the Long Bell Lumber Company. The company's debt to him is secured by a mortgage on certain assets of that company, and is evidenced by bonds held by him. He purchased these bonds upon the security of a mortgage on certain assets and upon the representation that the company would continue as a going concern, maintaining the valuable good will it had built up through a long course of successful business. The officers and directors of the Long Bell Lumber Company have illegally and in fraud of creditors transferred assets other than those covered by the mortgage, and so have destroyed the credit and good will value of the company and its ability to carry on. By this and other alleged mismanagement of the company's affairs the value of the complainant's bonds has been lessened and his investment jeopardized.

Perhaps a clearer understanding of the case made by the bill will be had if its necessary intricacies and voluminous allegations are set to one side and we suppose the case concerns a small corporation engaged in the sale of merchandise as, for example, lumber. Let us call it the A B Lumber Company. X, an individual, holds the note of that company as evidence of its debt to him in the amount of $1,000. The note is secured by a mortgage upon the real estate owned by the company. When X made a loan to the company and took its note, it was represented to him that the investment was a good one, not only because of the value of the real estate covered by the mortgage, but also because the busi-

ness had been profitable. He believed the business would continue to be carried on and would continue profitable. The officers of the company, after the note was given, managed the affairs of the company in an extravagant and wasteful manner. They disposed of the company's unincumbered assets in such a way as to greatly lessen the company's credit, depreciate the value of its good will, and render it incapable of continuing in business. In these respects their actions were beyond their lawful powers. They were motivated by an intention to make more secure the debts of creditors other than X. The A B Company, however, still has assets and is not insolvent. In such a state of facts, does X have any right to have a court of equity take over the business of the A B Lumber Company through a receiver appointed by it? If X has such a right in such a state of facts, then it seems to me that complainant here in this much more complicated state of facts would have that right.

■ 1. I approach the ultimate question raised by the motion to dismiss, first, by considering what the law is as to the right of an unsecured creditor of a corporation to maintain a proceeding in equity for a receivership.

As to this, the law seems to be quite well declared in decisions of the Supreme Court. I quote from one of them. In Pusey & Jones Company v. Hanssen, 261 U. S. 491, 497, 43 S. Ct. 454, 455, 67 L. Ed. 763, it was said: "A receiver is often appointed upon application of a secured creditor who fears that his security will be wasted. * * * A receiver is often appointed upon application of a judgment creditor who has exhausted his legal remedy. * * * But an unsecured simple contract creditor has, in the absence of statute, no substantive right, legal or equitable, in or to the property of his debtor. This is true, whatever the nature of the property, and although the debtor is a corporation and insolvent. The only substantive right of a simple contract creditor is to have his debt paid in due course. His adjective right is, ordinarily, at law. He has no right whatsoever in equity until he has exhausted his legal remedy."

The rule thus declared is amply supported by other equally authoritative cases, Hollins v. Coal & Iron Company, 150 U. S. 371, 378, 14 S. Ct. 127, 37 L. Ed. 1113; Lion Bonding & Surety Company v. Karatz, 262 U. S. 77, 85, 43 S. Ct. 480, 67 L. Ed. 871; Harkin v. Brundage, 276 U. S. 36, 52, 48 S. Ct. 268, 72 L. Ed. 457, and still others of less authority, Home Mortgage Company v. Ramsey (4 C.

C. A.) 49 F.(2d) 738, 742; Viquesney v. Allen (4 C. C. A.) 131 F. 21, 24. Doubtless there are exceptions to this as to all general rules, but I consider it unnecessary to state here or to elaborate the exceptions.[1] Whatever the exceptions, they do not include a case in which a simple contract creditor seeks receivership for a corporation which has transferred a part only of its assets, which is not alleged to be insolvent, even although it is alleged that its officers and directors have been guilty of mismanagement and waste and have impaired its credit and good will. The theory underlying the general rule is that the creditor has an adequate legal remedy and may not seek relief in equity until he has exhausted that legal remedy or has pleaded facts showing conclusively that his legal remedy would be without avail.

■ 2. Next I consider what the law is as to the right of a secured creditor of a corporation to maintain a proceeding in equity for a receivership.

That in certain states of facts receivers will be appointed on applications of secured creditors to take over all the assets of a corporation is well recognized. The secured creditor has an interest in specific property. Justification for a receivership arises from that interest and a necessity for its protection. If there is that in the conduct of the officers and directors of a corporation which lessens or threatens to lessen the value of the very property in which the secured creditor has an interest by reason of his security, a court of equity may take charge of the corporation and all its assets to the end that the creditor's security may not be jeopardized. As was said by the Supreme Court in Kountze v. Omaha Hotel Company, 107 U. S. 378,

395, 2 S. Ct. 911, 926, 27 L. Ed. 609: "Courts of equity always have the power, where the debtor is insolvent, and the mortgaged property is an insufficient security for the debt, and there is good cause to believe that it will be wasted or deteriorated in the hands of the mortgagor, as by cutting of timber, suffering dilapidation, etc., to take charge of the property by means of a receiver, and preserve not only the corpus, but the rents and profits for the satisfaction of the debt."

Whatever other facts must be shown in order that an action for the taking over of the property of a corporation may be maintained by a secured creditor, I consider that an indispensable showing is that the very property which has been mortgaged is being wasted or is threatened with depreciation and to such an extent as that the security has become, or is likely to become, insufficient for the debt. The secured creditor has not been harmed, and therefore has no basis for a proceeding in equity until and unless the mortgaged property becomes or is about to become of less value than the debt which it secured.

3. The secured creditor looks not only to the property on which he has a mortgage for the ultimate payment of his debt. He relies also, of course, on the personal responsibility and general credit of his debtor. The debt is the thing. The security is but a means for enforcing payment. When the mortgaged property has been sold, the creditor may look to the debtor to make up the deficiency, if there is one. As a secured creditor he has a special means for the collection of his debt, but he has also all of the means for collection which a simple contract creditor has, and may enforce the collection of his debt as a simple contract creditor might. His is a dual character, in a sense. He has the combined rights of a secured and a simple contract creditor. It would seem to be perfectly clear, however, that he does not have more than the combined rights of these two, and that, if nothing has been done which lessens or threatens to lessen the value of the mortgaged property which secures his debt, then he cannot maintain a proceeding in equity unless a simple contract creditor might maintain such a proceeding. Scott v. Farmers' Loan & Trust Company (8 C. C. A.) 69 F. 17, 20; Home Mortgage Company v. Ramsey (4 C. C. A.) 49 F.(2d) 738, 742. If nothing has been done to lessen or to threaten the lessening of the value of the mortgaged property, he cannot have a receivership, since a simple contract creditor could not have.

[1] Learned counsel for complainant have cited Case v. Beauregard, 101 U. S. 688, 25 L. Ed. 1004, Wyman v. Wallace, 201 U. S. 230, 26 S. Ct. 495, 50 L. Ed. 738, and Williams v. Adler-Goldman Commission Company (8 C. C. A.) 227 F. 374, as supporting the doctrine that even a simple contract creditor may proceed in equity against the property of his debtor. In none of these cases, however, was a receivership involved. The most that was ruled in Case v. Beauregard was that a bill alleging that a debtor is insolvent and has no property subject to execution sufficiently shows the creditor has no adequate legal remedy. Wyman v. Wallace holds only that a creditor may enforce in equity satisfaction of his debt out of property conveyed to a trustee as security for the debt. Williams v. Commission Company holds that a creditor may maintain a bill, though his debt has not been reduced to judgment, if he alleges and proves the insolvency of his debtor. Against this holding is to be noted the declaration in Pusey & Jones Company v. Hanssen, 261 U. S. loc. cit. 497, 43 S. Ct. 454, 455, 67 L. Ed. 763, "an unsecured simple contract creditor has * * * no substantive right * * * in or to the property of his debtor * * * although the debtor is a corporation and insolvent."

He cannot maintain a receivership proceeding as a secured creditor, because in that capacity he has neither received nor been threatened with injury, and he cannot maintain a receivership proceeding in his capacity as a simple contract creditor, because either he has an adequate legal remedy or has not shown facts establishing the conclusion that his legal remedy would be without avail.

4. I am satisfied that the foregoing statements of the law are right in principle and are supported by the most authoritative decisions of the courts. There remain indeed other legal questions to be considered. Deferring them, I inquire whether in the light of the principles of law thus far stated the complainant's bill states a cause of action in equity. The inquiry must be negatively answered.

The complainant is a secured creditor of the Long Bell Lumber Company. The bonds he has are secured by a first mortgage on certain property. While it is not entirely clear as to exactly what property the mortgage covers and as to exactly where that property is situated, the inference reasonably may be drawn from the whole bill (it is an inference which is strengthened by the fact that assertions of defendants' counsel in oral and written argument stand undenied) that the property covered by the mortgage is such physical property as standing timber, plants, mills, and other tangible assets of a like character located in various states, not including Missouri, and especially not including the Western district of Missouri.

There is no allegation in the bill that anything has been done by the officers and directors of the Long Bell Lumber Company to transfer title to these mortgaged properties, to permit with respect to them waste or deterioration, or in any other way to bring about a lessening of their value so as to impair the security of the company's bondholders, including the complainant. In other words, there is no such showing in the bill as entitles the complainant in his capacity as a secured creditor to maintain a proceeding for a receivership.

If the complainant is taken out of his character as a secured creditor and is considered in his character as a simple contract creditor, and, as we have seen, he may be considered in both characters, then also he has not stated facts entitling him to maintain a proceeding in equity for a receivership. He is shut out by the rule stated in Pusey & Jones Company v. Hanssen, supra, and he does not state a case within any of the exceptions to that rule.

I do not consider that the fact that none of the mortgaged property is located within the Western district of Missouri is at all essential to the conclusion that as a secured creditor the complainant has not stated a cause of action. If that mortgaged property were located within this district, it would still be necessary to show that the officers and directors of the Long Bell Lumber Company had done something with respect to it lessening its value as security for complainant's debt.

True it is that in the bill there are such allegations as that the actions of the officers and directors of the Long Bell Lumber Company have depleted, dissipated, and wasted the assets of the company to the detriment of the complainant, that by their actions the secured and unsecured creditors of the lumber company have been prejudiced and injured, that the securities of the complainant and other bondholders have been impaired and depreciated; but these are allegations of conclusions, not of facts. No single fact is anywhere alleged supporting a conclusion that any mortgaged thing securing the debt to the complainant or any bondholder has been touched by the officers and directors of the lumber company or in any way dealt with so as to lessen its value as security.

The contention of the complainant seems to be that he was induced to buy the bonds he holds, not only by the representation that his investment was safe by reason of the value of the property covered by the mortgage, but by representations as to the value of the whole property of the lumber company and as to its earning capacity as a successful and going business enterprise. He was more certain that his investment was a safe one by reason of these representations. Except for them he would not have purchased the bonds he holds. He relied in part upon general credit of the company. He assumed, although he does not allege that any such inducing representation was made to him, that the company would continue as a going concern, and he alleges, in effect, that by the acts of the officers and directors of the lumber company the foundation for that reliance, beyond the value of the mortgaged property, on account of which his money was invested, has been destroyed. But all of this does not add a particle to his rights as a secured creditor. The intangible elements of value which the Long Bell Lumber Company

had when its bonds were issued—its good will, its going concern value, its established credit—none of these was embraced within the property covered by the mortgage. If these intangible values have been dissipated and that unlawfully and through mismanagement, the complainant as a secured creditor has not been harmed. As an unsecured creditor, he cannot demand the equitable relief here sought by him.

5. But the complainant has another string for his bow. Even though it be admitted that, generally speaking, a secured creditor may not maintain a proceeding for a receivership if the mortgaged property by which he is secured has not been, through mismanagement, unlawfully depleted or dissipated or its value lessened, even though it be admitted that a simple contract creditor, generally speaking, may not maintain an action in equity for a receivership, still a statute may give to a creditor, secured or unsecured, such a right. The complainant here asserts a statutory basis for this proceeding. I consider this contention.

Complainant points to sections 4959, 4960, 4961, and 4598 of the Revised Statutes of Missouri for 1929 (Mo. St. Ann. §§ 4598, 4959–4961).

Section 4959, among other things, vests the state circuit court with jurisdiction over directors and officers of corporations to compel them to pay to the corporation "and to its creditors" the value of the property which they have transferred, lost, or wasted in violation of their duties or in abuse of their powers and to suspend and remove them from office for misconduct or abuse of trust. And section 4960 provides that the state circuit court may appoint receivers of the business property and effects of a corporation whose officers and directors have so been guilty of wrongful transfer or waste of the corporation's property and misconduct and abuse of trust. Section 4961 provides inter alia that the state circuit court may exercise the powers conferred by the two preceding sections upon a petition filed by "any creditor."

■ Upon first consideration it might seem that these statutes create an exception to all the general rules of law hereinbefore discussed, and that they give to any creditor the right to maintain an action for the appointment of receivers to take over the business, property, and effects of a corporation upon a showing that its officers and directors, in violation of their duties or in abuse of their powers, have transferred its property to others or have otherwise abused their trust

or been guilty of misconduct. It is contended by the defendants that these statutes are inapplicable here, first, for the reason that the right to institute a proceeding under them is given only to a judgment creditor; and, second, for the reason that allegations of the complainant's bill do not bring this case within the provisions of the statutes.

I do not agree with defendants that the very words "any creditor" in section 4961 mean any judgment creditor. To give them such a meaning by judicial construction is to assume that there is ambiguity in the simple phrase "any creditor." There is none. The words used are to be given their ordinary meaning. They do not require construction, and no Missouri case has construed them. Certainly no Missouri case has given to them the construction for which defendants make contention. Such Missouri cases as have had to do with section 4961 and the sections connected with it suggest no other construction than the natural one. See Alberger v. Bank, 123 Mo. 313, 27 S. W. 657; Glover v. Investment Company, 138 Mo. 408, 40 S. W. 110.[2]

■ But it does not follow that, because the words "any creditor" mean any creditor (therefore a simple contract creditor as well as a judgment or lien creditor), a simple contract creditor may maintain a proceeding for the receivership of a corporation if only he alleges in his petition that the officers and directors of a corporation of which he is a creditor, in violation of their duties and abuse of their powers, or fraudulently, have transferred, lost, or wasted the corporation's property or in some other way been guilty of misconduct and abuse of trust. The creditor

[2] A New York statute, somewhat similar to although not identical with the Missouri statute, gives "a creditor of the corporation" the right to institute a proceeding in equity for an accounting by officers and directors of the corporation. The Appellate Division of the Supreme Court of New York has construed the phrase "a creditor of the corporation" to mean a judgment creditor. Steele v. Isman, 164 App. Div. 146, 149 N. Y. S. 488. The opinion in that case, however (and so also as to the opinions in other cases cited in Steele v. Isman), is not convincing. The conclusion reached is put on the ground of public policy. Moreover, the conclusion is not unqualified, for it is strongly intimated that the phrase "a creditor of the corporation" would include a creditor, not a judgment creditor, who had alleged facts showing the futility of obtaining judgment. This is an intimation inconsistent with the asserted interpretation of the phrase. The words "any creditor" in a Delaware statute, the Delaware courts not having construed the phrase, were "assumed" by the Supreme Court of the United States in Pusey & Jones Company v. Hanssen, supra (see footnote 261 U. S. 495, 43 S. Ct. 454, 455, 67 L. Ed. 763), to include an unsecured simple contract creditor.

must allege more. He must allege facts showing that such wrongful conduct has affected his rights or his property. If he has a lien on particular property which has been wrongfully transferred or wasted, then his property has been affected. If he is a judgment creditor and as such has a lien on all of the assets of the corporation and the assets of the corporation have been transferred or wasted, then his property has been affected. If the corporation is insolvent and its assets are wrongfully transferred or wasted, his rights have been affected. But, if he is a simple contract creditor, if the corporation is not insolvent, how can he be injured by a transfer or waste of certain property, however wrongfully done. And, if he is not injured, how can he maintain an action? The Legislature intended to confer by these sections a right of action upon any creditor who had been hurt and not upon any creditor without regard to whether he was affected or not affected by the improper actions of the officers of a corporation. In the case of Alberger v. Bank, supra, it appears that the corporation involved was insolvent. In the case of Glover v. Investment Company, supra, the plaintiff was a judgment creditor.

Certainly the words "any creditor," as used in section 4961, must be read in connection with the words "its creditors," as used in section 4959. The right of "any creditor" to go into equity is to secure the exercise by the circuit court of the jurisdiction "to order, decree and compel payment by them [corporation officers and directors] to the corporation which they represent, and to its creditors, of all sums of money and of the value of all property which they may have acquired to themselves, or transferred to others, or may have lost or wasted by any violation of their duties or abuse of their powers as such directors, managers, trustees or other officers of such corporation."

I think it cannot reasonably be contended that some new substantive right is conferred by this last-quoted language upon creditors of corporations. It is not possible that it was intended that the circuit court should have power to "compel payment" to a creditor of the debt of a solvent corporation out of sums of money wrongfully transferred, regardless of whether the corporation was thereby rendered incapable of paying its debt in the usual course and ordinary manner, and it was not intended that the circuit court should have power to compel in this manner the payment of a debt which was not yet due or not yet adjudicated, nor was it intended that the circuit court should be vested with some new power to adjudicate a claim a creditor might assert. Rather the language used assumes a debt already reduced to a judgment, a right already established to the very property which has been wrongfully transferred or diverted or lost or wasted. It will be noted that the jurisdiction of the circuit court is to compel payment "to the corporation" and "to its creditors." But obviously the same sum cannot at once be paid to the corporation and to the creditors of the corporation. Primarily the money wrongfully dissipated belongs to the corporation and is to be repaid to it. It is to be paid directly to the creditors if their rights to it already have been established as against the corporation. The language of the statute is consistent with this conclusion and any other conclusion involves so radical a departure from established legal principles as should be adopted only if made mandatory by the words used in the statute.

The receivership authorized in section 4960 is a receivership, so far as creditors are concerned, in aid of jurisdiction to compel payment of debts owing them, but a simple contract creditor cannot, in the courts of the United States, compel payment of any debt owing him by a corporation by a proceeding in equity. He must resort to a proceeding in law "to compel payment." The Constitution of the United States in effect so provides. Amendment 7. The Constitution of Missouri similarly in effect so provides. Article 2, § 28. Therefore the provision for a receivership upon the petition of a creditor to compel payment of a debt owing the creditor necessarily implies that the creditor shall first have a right established in law to such payment.

Tested by these principles, the bill does not state a cause of action in equity under the statutes relied on by the complainant. Assuming, without deciding, that the bill does sufficiently allege a wrongful transfer of the assets of the Long Bell Lumber Company and that it does sufficiently allege mismanagement of its property and the wasting of its assets, other than those covered by the mortgage, it does not allege any facts supporting a conclusion of injury to the complainant. There is no allegation of insolvency. The complainant has no lien resulting either from the mortgage or from any judgment on any of the assets said to have been wrongfully transferred or depreciated in value. Some or all of these allegations are essential to state a cause of action under the statutes.

6. It is unnecessary to consider whether the statutes confer a substantive right upon a creditor which he can enforce in a federal court or only a remedial right as to which he is restricted to the courts of the state. It would appear, however, that the right given to a creditor to institute a receivership proceeding by the statutes cited is a remedial one only secured to him in the state courts. As was said by the Supreme Court in Pusey & Jones Company v. Hanssen, supra, "The only substantive right of a simple contract creditor is to have his debt paid in due course."

Counsel for complainant have called my attention to the case of Jones v. Mutual Fidelity Company, 123 F. 506, decided by the Circuit Court for the District of Delaware in a scholarly and exhaustive opinion, in part based on the decision of the Court of Appeals for the Eighth Circuit in Darragh v. H. Wetter Mfg. Company, 78 F. 7. I have read these two cases carefully. The first deals with a statute of Delaware giving to the creditor of an insolvent corporation the right to proceed in equity for a receivership, and the second deals with a statute of Arkansas, of like character with the Delaware statute. Both the Delaware Circuit Court and the Court of Appeals of the Eighth Circuit held that these statutes give to a simple contract creditor a new substantive equitable right and that he may enforce that right in a federal court of equity, carrying to that court the equitable remedy provided in the state statute. The effect of these decisions, however, is destroyed by the decision of the Supreme Court in the Pusey & Jones Company Case. That case dealt with the same statute as was considered in Jones v. Mutual Fidelity Company. Jones v. Mutual Fidelity Company and also Darragh v. Wetter were cited to the Supreme Court, and were expressly declared by that court incorrectly to state the law. The Supreme Court said as to the Delaware statute: "But it is not true that this statute confers upon the creditor a substantive right. * * * The Delaware statute does not confer upon creditors the right to have a receiver appointed, although the insolvency of the corporation may be palpable, hopeless and attended by indisputable fraud or mismanagement. Insolvency is made a condition of the Chancellor's jurisdiction; but it does not give rise to any substantive right in the creditor. * * * Whatever its exact nature, the power enables the Chancellor to afford a remedy which theretofore would not have been open to an unsecured simple contract creditor. But because that which the statute confers is merely a remedy, the statute cannot affect proceedings in the federal courts sitting in equity."

If the Delaware statute which was considered in Jones v. Mutual Fidelity Company and also in Pusey & Jones Company v. Hanssen does not confer a substantive right upon a creditor, a fortiori the Missouri statutes do not confer a substantive right upon a creditor. The Delaware statute provides that a creditor may ask for a receiver for an insolvent corporation to wind up its affairs and to permit him to share in a distribution of its assets, but it gives him no right to such a receivership. As the Supreme Court said, the statute but states conditions for the exercise of the jurisdiction of the court of equity enabling the chancellor to afford a remedy which theretofore would not have been open. The Missouri statutes do no more than to give to a creditor the right to petition for the exercise of the jurisdiction of a court of equity under certain circumstances to compel payment of his debt out of wrongfully transferred assets or misused funds of a corporation, as an incident to which jurisdiction a receiver in the discretion of the court of equity may be appointed. Here also no substantive right is conferred, but only a power is given to the court of equity to afford a remedy which theretofore would not have been open to the creditor. It is not a remedy of which avail may be taken in the United States court.

7. As an incident to the receivership prayed by complainant, he asks for an accounting by the officers and directors of the Long Bell Lumber Company. Since an accounting is sought only as an incident to the proposed receivership, I shall not lengthen this opinion by discussing the question whether facts have been stated entitling the plaintiff to this lesser relief. I am satisfied under the allegations of his bill he is not entitled to such an accounting.

### Conclusion.

I have found no case, and none has been cited, which seems to me upon facts such as are pleaded in the bill here to support a conclusion that a cause of action has been stated.[3] My judgment is that upon principle

[3] The complainant has cited the following cases as supporting his bill in this case: In re Veach (C. C. A.) 4 F.(2d) loc. cit. 334; Adler v. Seaman (C. C. A.) 266 F. 828; Seaman v. McCulloch et al. (C. C. A.) 8 F.(2d) 820, certiorari denied, 271 U. S. 671, 46 S. Ct. 485, 70 L. Ed. 1143; Barry v. Refineries, Inc. (D. C.) 13 F.(2d) loc. cit. 251; Reinhardt v. Telephone Co., 71 N. J. Eq. 70, 63 A. 1097; Alberger v. Bank, 123 Mo. loc. cit. 320, 27 S. W. 657, 658;

and authority it must be ruled that no cause of action in equity has been stated, and that therefore the motion to dismiss should be sustained. The importance of the cases is such, however, and the opportunity of the parties fully to present and argue the questions raised by the motion to dismiss has been so limited, that I feel it is proper to say that, if the parties desire, further argument not only will be permitted, but will be welcomed.

Sweeney v. Mining Co. et al., 194 Mo. App. 140, 186 S. W. 739; Ingram v. Coal Co., 319 Mo. loc. cit. 653, 5 S.W.(2d) 413; Goodwin v. Express Co., 220 Mo. App. 695, 294 S. W. 100; Kinsella v. Finance Corp. (Mo. App.) 28 S.W.(2d) loc. cit. 429; Johnson v. Rys. Co., 281 Mo. 90, 219 S. W. 38; Express Co. v. Commonwealth, 190 Ky. 636, 228 S. W. 433, 30 A. L. R. 543; Williams et al. v. Adler-Goldman Com. Co. et al. (C. C. A.) 227 F. 374; Case v. Beauregard, 101 U. S. 688, 25 L. Ed. 1004; U. S. v. Fairall (D. C.) 16 F.(2d) 328. Each of these cases I have read and considered.

In the case of In re Veach, supra (the cases of Adler v. Seaman, supra, and Seaman v. McCulloch, supra, are companion cases), was a case in which it appears that the defendants consented to the appointment of a receiver [see Seaman v. McCulloch (C. C. A.) 8 F.(2d) 820, 823], and in which, therefore, the question as to when a secured creditor might compel a receivership or as to when an unsecured creditor might petition for a receivership was not involved. Moreover, it appears that the secured creditor in his petition for a receivership alleged among other things, the insolvency of the defendants, the threatened foreclosure of prior mortgages, and the consequent destruction of the security for his claim. These allegations go beyond those in the present bill in important respects so that these cases would not be persuasive nor conclusive here even if the the receivership had not been by consent. Barry v. Refineries, Inc., supra, was a District Court case. It does not discuss the right of a secured creditor of a corporation to have a receivership by reason of the wrongful action of the officers and directors of that corporation in transferring its assets. It is in point on the question whether transfer by a corporation of all of its assets for the stock of another company is an excess of power and fraudulent, but is not in point on the principal question as to what right to a receivership, if any, arises from such a transfer. Alberger v. Bank, supra, a decision of the Supreme Court of Missouri, was a suit by a creditor of an insolvent corporation for a receivership by reason of the alleged wrongful acts of its officers and directors in preferring certain creditors. It was held that such preferences were not unlawful, and that even the insolvency of a corporation did not give to simple contract creditors any lien upon its property nor result in any direct trust thereon in their favor. A receivership was not held warranted upon the facts. There is reference in the case to the Missouri statutes involved in the present case, but no more is said about them than that "the courts are invested with statutory power to enforce a proper performance of duty by all officers of corporations at the instance of creditors as well as of stockholders; and may even take charge of the corporate property and business, through the agency of a receiver, if necessary, for that purpose." Beyond this reference to the statutes, they are not discussed. Reinhardt v. Telephone Company, supra, a decision of the Court of Chancery of New Jersey, construes a section of the Corporate Act of that state providing for a creditor's bill first to establish the insolvency of the corporation and then to administer its assets. Obviously this statute is entirely different from the Missouri statutes relied on in this case. Sweeney v. Mining Company, supra,

## Opinion after Trial.

These cases have been consolidated for trial and have been tried as one case. The issues of law and fact are identical in the two cases.

The original bills were filed in this court January 12 and January 27, 1932. Motions to dismiss them on the ground that they did not state facts entitling complainants to the

decided by the Springfield, Mo., Court of Appeals holds only that, where one corporation takes over all of the property of another, a creditor of the first may pursue against the second whatever remedies he had against the first; the stockholders and officers of the two companies being the same. There is no discussion in the case as to the right of a secured or simple contract creditor to the remedy of receivership. Ingram v. Coal Company, supra, a decision of the Supreme Court of Missouri, was a suit at law for damages for personal injuries in which all of the property of one corporation, the corporation primarily liable, had been transferred to another. All that is held in the case is that in such a situation the purchasing corporation is liable for the debts and liabilities of the selling corporation if the transaction between the two was fraudulent in fact or if it was of such a nature that the purchasing corporation was a mere continuance of the selling corporation. The opinion does not discuss questions involved in the present case. Goodwin v. Express Company, supra, a decision of the St. Louis, Mo., Court of Appeals, is to the same effect, and is no more relevant to the questions in this case. Kinsella v. Finance Corporation, supra, was a decision of the St. Louis, Mo., Court of Appeals, as to the rights of a judgment creditor of one corporation as against another corporation which has taken over all of the assets of the first. In the present case complainant is not a judgment creditor, nor have all of the assets of his debtor corporation been transferred to another. Johnson v. Railways Company, supra, was a case in which the right of a judgment creditor to pursue in equity assets of his debtor corporation which had been transferred without consideration to another corporation. The case is clearly distinguishable from the present one. It was not a receivership proceeding. Express Company v. Commonwealth, supra, a decision of the Court of Appeals of Kentucky, was a case in which it was held that, where property is transferred by one corporation to another so that the first has nothing left with which to meet its liabilities to creditors, that then, under certain circumstances, a creditor of the first may be entitled in equity to proceed against the second to recover his debt. Williams v. Commission Company, supra, I have distinguished from the present case in the principal opinion as I have also distinguished Case v. Beauregard, supra. United States v. Fairall, supra, a District Court opinion, holds only that a creditor may pursue in equity the assets of a dissolved corporation without first having obtained a judgment at law if there are facts pleaded establishing the impossibility of obtaining such a judgment or its futility if obtained

In none of the cases cited is there any support for what must be contended for by the complainant in this case; that is, the right of a secured creditor to maintain a proceeding in equity for the receivership of a corporation with no showing that the property mortgaged for his security has been transferred or in any way wasted or the right of an unsecured creditor to maintain a proceeding in equity for a receivership with no showing either that the corporation is insolvent or that his claim has been reduced to judgment or of facts establishing either the impossibility of procuring a judgment or its valuelessness if procured.

equitable relief they prayed were submitted by the defendants. After argument, a memorandum opinion was handed down in which it was indicated that the motions to dismiss would be sustained. I summarized, in that opinion, the allegations of the original bills, and stated what I conceived to be the rules of law applicable to the facts alleged. I held that a secured creditor could not have a receiver appointed for the property of his debtor unless he alleged and proved that the very property on which he had a lien was being so wasted by the debtor or by him threatened with waste as that it was likely to become insufficient security for the debt. Kountze v. Omaha Hotel Company, 107 U. S. 378–395, 2 S. Ct. 911, 27 L. Ed. 609. I held that an unsecured creditor, in the absence of some statute, had no right whatsoever in equity to the property of his debtor until his legal remedies had been exhausted. Pusey & Jones Company v. Henssen, 261 U. S. 491–497, 43 S. Ct. 454, 67 L. Ed. 763; Hollins v. Coal & Iron Company, 150 U. S. 371–378, 14 S. Ct. 127, 37 L. Ed. 1113; Lion Bonding Company v. Karatz, 262 U. S. 77–85, 43 S. Ct. 480, 67 L. Ed. 871; Harkin v. Brundage, 276 U. S. 36–52, 48 S. Ct. 268, 72 L. Ed. 457; Home Mortgage Company v. Ramsey (4 C. C. A.) 49 F.(2d) 738–742; Viquesney v. Allen (4 C. C. A.) 131 F. 21–24. I held that, while a secured creditor had all the rights to apply for a receiver of the property of his debtor that an unsecured creditor might have, he did not have more than the combined rights of a secured and an unsecured creditor. Scott v. Farmers' Loan & Trust Company (8 C. C. A.) 69 F. 17–20; Home Mortgage Company v. Ramsey (4 C. C. A.) 49 F.(2d) 738–742. And I held that in a court of the United States the rights of the complainants to the appointment of a receiver as prayed by them in their bills were not greater by reason of any Missouri statute than those conferred by general law. Pusey & Jones Company v. Hanssen, 261 U. S. 491–497, 43 S. Ct. 454, 67 L. Ed. 763. It is unnecessary again to travel over the road by which these conclusions were reached or to present again the reasoning supporting them. The time I have for these cases now requires me to proceed from the point which was reached when the opinion on the motions to dismiss was filed.

There resulted from that opinion important amendments of the bills. Whereas the original bills alleged that complainants were holders of bonds secured by a mortgage on various properties of the Long Bell Lumber Company and described other properties of that company as free and unincumbered, the bills in their present form allege that the bonds were secured, not only by a mortgage on described properties, but also by an equitable lien on all the properties of the Long Bell Lumber Company. Whereas the original bills alleged that as of the time of the filing of the bills the assets of the Long Bell Lumber Company far exceeded its liabilities, the bills in their present form allege that the Long Bell Lumber Company as of that time was insolvent.

Motions to dismiss the bills as they now are were filed by the defendants, argued and overruled. Similar motions are incorporated in the answers. I was of the opinion that, in view of the amendments to the bills, they were good as against motions to dismiss. It seemed to me to be desirable that the cases should be tried on their merits. They have been so tried.

The complainants are owners of bonds (together they own bonds in a face amount of less then $10,000) of the Long Bell Lumber Company.[4] The bonds so owned by them are a part of the total issue of $28,000,000. Bonds of this issue were and are secured by a first mortgage on certain described properties of the Long Bell Lumber Company. Whether they are secured also by an equitable lien on all the assets of the Long Bell Lumber Company owned by that company when the bonds were issued, as I conceive it, the principal question in these cases which was not disposed of by the ruling on the motions to dismiss.

The theory of the present bills is that the officers and directors of the lumber company by fraudulent acts and mismanagement have so diminished the properties by which the bonds were secured as to jeopardize their security. The relief which the complainants seek is the appointment of a receiver who will be charged with the duty of recovering properties alleged wrongfully to have been

---

[4] The total bond issue authorized by the Long Bell Lumber Company was $30,000,000. The maximum actually issued totaled $28,000,000. Of the amount issued, $23,253,400 were outstanding on November 1, 1930. The bonds now outstanding total $20,206,500. In the bills filed by the complainants they invite other bondholders to intervene. The total amount of bonds owned by the complainants and all interveners is $20,600. It was brought out at the trial that an overwhelming majority of all bondholders (bondholders holding approximately 74 per cent. in amount of all outstanding bonds) are opposed to the appointment of a receiver for the Long Bell Lumber Company and its subsidiaries. That opposition was voiced at the trial by counsel for the Bondholders' Protective Committee. He expressed the view that the best interests of the bondholders would be served if the prayers of complainants' bills are denied.

parted with by the lumber company, with the duty of operating that company and its subsidiaries and with the duty ultimately of liquidating their properties if that should prove necessary in the interests of complainants and other creditors.

The important facts alleged in the bills and developed by the proof are these:

(1) In 1932, the Long Bell Lumber Company authorized an issue of bonds in the total amount of $30,000,000. They were to be issued in three series, A, B, and C. Actually there was issued of series A, due July 1, 1942, of series B, due April 1, 1943, and of series C, due August 1, 1946, bonds in a total amount of $28,000,000. The complainants own certain of these bonds. Payments of interest on outstanding bonds have not been made since January 1, 1932.

(2) The payment of the bonds making up series A, B, and C was secured by a first mortgage on various properties of the Long Bell Lumber Company described in that mortgage, chiefly timber and mills. This mortgage is in evidence as Defendants' Exhibit V.

(3) The bonds issued by the Long Bell Lumber Company were sold to the public through Halsey-Stuart & Co. of Chicago. In their sale, certain circulars authorized by the Long Bell Lumber Company, introduced in evidence as Complainants' Exhibits 2, 3, and 4, were used. In these circulars various representations were made to prospective purchasers of the bonds.

(4) Practically speaking, the Long Bell Lumber Company has not parted with the ownership of any of the properties described in the mortgage securing its bonds. It has not transferred those properties to any other nor in any way incumbered them. In no substantial way has the integrity of these properties been disturbed.

(5) In October, 1930, the officers and directors of the Long Bell Lumber Company caused to be formed, under the laws of Delaware, the Long Bell Lumber Sales Corporation. All of the stock of that corporation is and has been held by the Long Bell Lumber Company. To that corporation, in November, 1930, the lumber company transferred essentially all its assets not described in mortgage. The value of the assets so transferred was approximately $27,000,000. The consideration for the transfer was the capital stock of the sales corporation and the assumption by that corporation of debts of the lumber company in approximately the amount of $7,047,500. The sales corporation was formed and the assets of the lumber company transferred to it on the recommendation of creditor banks of the lumber company. Its formation and the transfer of assets to it was required by the banks as a condition of the renewal by them of bank loans and the continuance of lines of bank credit. The officers and directors of the lumber company, and also the banks, fully understood and intended that the effect of the formation of the sales corporation and the transfer of the assets to it was to put the banks, so far as the assets transferred to the sales corporation were concerned, in a preferred position to that of all other creditors of the lumber company, including its bondholders.

(6) What is called a "syndicate loan agreement" was entered into November 1, 1930, between the Long Bell Companies on the one hand and the creditor banks on the other hand, providing for an extension of bank credit for a fixed period to the Long Bell Lumber Sales Corporation. A second such agreement was entered into July 1, 1930, and a third December 31, 1931. These agreements are in evidence as Complainants' Exhibits 6, 7, and 8. Among other things, the last two of said agreements requires a contract to be entered into (and such a contract was entered into) between the Long Bell Lumber Company and the Long Bell Lumber Sales Corporation, containing a provision as follows: "During the continuation of this lease (reference is to a lease of lumber mills to the Sales Corporation) it shall have the right to cut and remove, at each of the manufacturing plants hereby leased, standing timber or other timber which the Lumber Company would have the right to cut and remove. For the timber so cut by the Sales Corporation, in any calender month, it shall, as hereinafter provided, pay out of its net profits for said month, as defined in the second succeeding sentence hereof, (but shall not be otherwise obligated to pay) to the Lumber Company the book value of said timber as shown on the books of the Lumber Company from time to time. As rental for the property hereby leased, for each calendar month, the Sales Corporation shall, as hereinafter provided, pay out of its net profits for said month as defined in the next succeeding sentence hereof (but shall not be otherwise obligated to pay) to the Lumber Company an amount equal to the accrued taxes and insurance on said property for said month." The sales corporation has made no profits.

On the contrary, it has been operated at a loss. Since it has sustained no profits, it has paid nothing for the timber of the lumber company which it has cut and manufactured. The value of the properties covered by the mortgage have not, however, thereby been reduced nor the security behind the bonds in any wise lessened, since the alternative to the arrangement required by the syndicate loan agreements would be the cessation of manufacture and the discontinuance of the Long Bell business as a going concern. Such a cessation of manufacture and discontinuance of active operations would greatly depreciate the actual value of the properties covered by the mortgage and so seriously disadvantage the bondholders of the Long Bell Lumber Company.

(7) There has been no showing in this case which would justify a finding that the Long Bell Lumber Company, when the bills were filed or now, is insolvent. The value of its assets greatly exceed its liabilities. It has become financially embarrassed as a result of the depression which has affected it and all other industries. Its present inability to pay certain of its obligations has been solely caused by the depression and has not resulted from any mismanagement upon the part of the officers and directors of the company or fraud on their part, actual or constructive.

1. Whether these facts are of any significance depends on the validity of complainants' contention that they, as bondholders, had an equitable lien on the properties conveyed by the lumber company to the sales corporation. Perhaps if there was such an equitable lien, the transfer of the properties to the sales corporation so as in effect to give the banks a claim against those properties superior to that of the bondholders would constitute such a jeopardizing of the bondholders' security as to warrant equitable relief for them. If, however, the bondholders had no equitable lien whatever on the properties so transferred, they are in no position in their capacity as secured creditors to complain of the transfer and its incidents.

█ I have found no fuller statement of the character and essentials of an equitable lien than that set out by the Supreme Court, speaking through Mr. Justice White (later the Chief Justice) in Walker v. Brown, 165 U. S. 654–664, 17 S. Ct. 453, 41 L. Ed. 865, and by the Circuit Court of Appeals for the Eighth Circuit, speaking through Judge Sanborn in Pierce v. Bank of Commerce, 268 F. 487, 494. Both cases quote Mr. Pomeroy with approval, as follows: "The doctrine [that is, of equitable lien] may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands, not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or incumbrancers with notice. Under like circumstances, a merely verbal agreement may create a similar lien upon personal property. The ultimate grounds and motives of this doctrine are explained in the preceding section; but the doctrine itself is clearly an application of the maxim, 'Equity regards as done that which ought to be done.' In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness an intent that the property so described, or rendered capable of identification, is to be held, given, or transferred as security for the obligation."

The whole doctrine of equitable lien finds its basis then in the maxim that equity looks upon things agreed to be done as actually performed. If it appears, either from the words of some written contract or some express verbal agreement or from the conduct and dealings of the parties, that a debtor has indicated an intention that some specifically described property shall be security for his debt, then in equity it will be considered a lien has been given upon that property. 37 Corpus Juris, 315.

These principles are clear. In the light of these principles it must be conceded that, if when it issued its bonds the Long Bell Lumber Company indicated to prospective purchasers of those bonds that property sufficiently described to be capable of being thereafter identified which the company then owned would stand as security for the debt evidenced by its bonds, then all such property so described became charged with an equitable lien. On the other hand, if no representation was made by the Long Bell Lumber Company from which such an intent could be inferred, then no equitable lien resulted.

The whole case of complainants, so far as the claimed equitable lien is concerned, rests on the circulars, exhibits 2, 3, and 4, issued to prospective purchasers of bonds. Indeed, it is expressly alleged in the bills that these circulars contained all the representations made by the Long Bell Lumber Company touching the security behind the bonds upon which complainants place reliance.

Of the three circulars, it is sufficient to consider the first to be issued, Exhibit B, dated July 1, 1922. Of the three, it alone describes and identifies any of the assets of the lumber company other than the properties covered by the mortgage. If this exhibit does not create an equitable lien, certainly Exhibits 3 and 4 do not.

It is so apparent that the circular of July 1, 1922, Exhibit 2, does not indicate an intention on the part of the lumber company that any of the assets of the company, except those described in the mortgage, shall be subject to a lien in favor of the bondholders or constitute any security for the bonds, that only the earnestness with which distinguished and learned counsel assert the contrary excuses discussion of the subject.

Discussion of the subject is difficult. It is as if one were required to maintain the affirmative of the proposition that Bunker Hill Monument points heavenward. "Behold the Monument!" is the best, almost the only, argument which can be made. "Read the circular!" is the all-sufficient answer to the contention that it discloses any intention to subject all the assets of the lumber company to a lien.

One paragraph in this circular is headed in large type, "SECURITY OF BONDS." This paragraph reads: "The First Mortgage Gold Bonds, Series 'A,' will be secured by a direct first mortgage on unencumbered standing timber having a value, as independently appraised, equal to at least 100% of the face amount of the outstanding Bonds, and will be further secured by a mortgage on plants, mills and other properties, having a value at least sufficient to make the aggregate security under the mortgage not less than 200% of the par amount of outstanding Bonds, both of which ratios the Company covenants to maintain at all times. The property to be immediately subjected to the lien of the mortgage includes, 1,317,368,640 feet of unencumbered standing timber, of which 90% is Southern yellow pine, and having a value, as independently appraised, of $13,783,215."

The circular thus in the clearest possible fashion sets out that the security behind the bonds is the property covered by and included in the mortgage. It is impossible that any one reading this paragraph reasonably could infer that it was the intention of the company that its assets, other than those included in the mortgage, were to be subjected to a lien.

Purchasers of bonds, of course, are and have a right to be interested in knowing something of the company whose bonds they are asked to buy. Behind the obligations of any individual or corporation, in addition to the property which may be mortgaged to secure the payment of that obligation, is the general credit of the individual or corporation. This circular, therefore, epitomized the history of the Long Bell Lumber Company, presented its balance sheet, stated what its earnings had been over a period of years, and described its properties generally. The closing subdivision of the circular is entitled, "BUSINESS." That subdivision includes the following: "The business is a complete industrial unit, comprising the ownership of raw material which is manufactures, wholesales and retails. 'From Tree to Trade' is the institutional slogan. Some idea of the extent of the organization may be gathered from the fact that in the states of Missouri, Kentucky, Kansas, Texas, Louisiana, Oklahoma, California, Arkansas, Mississippi, Oregon, New Mexico and Washington, it owns: 127 retail lumber yards selling 78,-000,000 feet of lumber per annum. 11 modern saw mills with a capacity of 2,000,000 feet per day, or 570,000,000 feet per annum. 12 planing mills. 61 dry kilns. 8 sash and door, box, veneer and other wood products plants, windows and doors manufactured (average per annum) 875,000. 22 general merchandise (retail) stores (average annual sales over $3,000,000) used in connection with its manufacturing enterprises. 1 wholesale grocery (average annual sales over $1,000,-000). 2,100 dwelling houses in connection with its mills. 363 miles of railroad and equipment including 77 locomotives and 1,131 log and freight cars. 11,672,882,622 feet log scale of standing timber of highest commercial quality. 1,003,407 acres of land—a large part particularly in the South, suitable for farming. The Company ships 27,597 cars of lumber and lumber products per year (3-year average) and averages 6,500 persons upon the payroll."

Complainants point to this paragraph of the circular as some support for the contention made by them that it was the inten-

tion of the Long Bell Lumber Company to give purchasers of bonds a lien on all of the property described in the circular as owned by the company. The contention is untenable. To assert it is to say that the company intended to destroy itself as a great business enterprise, for, if it intended, as complainants argue, to subject every tree in its forests, every board in its lumber yards, every locomotive on its tracks, every sack of flour on the shelves of its retail grocery stores, to a lien in favor of the bondholders, then it could not thereafter rightfully offer any of such property for sale upon the market or otherwise dispose of it. An equitable lien is quite as binding and real a thing as one in law. To the same extent it involves the appropriation of property as security and takes out of the owner's hands the right to dispose of that property without the consent of him in whose favor the lien has been created. That the Long Bell Lumber Company did not intend to subject all of the property described as owned by it to a lien in favor of its bondholders and did intend only to subject the mortgaged property to such a lien stands out from this whole circular in glaring prominence.

The issue of equitable lien or no equitable lien must be resolved against complainants.

2. Complainants' cases, so far as they present questions not already decided, in my judgment, are dependent upon the allegations and proof of facts establishing an equitable lien, and the resolution of that contention against them really concludes these proceedings. Without the equitable lien, the complainants are again, as in the original bills, only unsecured creditors, so far as the assets transferred to the sales corporation are concerned. And while there have been some cases which have intimated that an unsecured creditor may maintain a bill in equity for relief against the debtor, even although his debt has not been reduced to a judgment, if he alleges and proves the insolvency of his debtor, the Supreme Court has said (Pusey & Jones Company v. Hanssen, supra) in positive and unequivocal language that "an unsecured simple contract creditor has, in the absence of statute, no substantive right, legal or equitable, in or to the property of his debtor. This is true, whatever the nature of the property, and although the debtor is a corporation and insolvent. The only substantive right of a simple contract creditor is to have his debt paid in due course. His adjective right is, ordinarily, at law. He has no right whatso-

ever in equity until he has exhausted his legal remedy."

Notwithstanding, then, the bills in their present form allege insolvency of the Long Bell Lumber Company, it must be said in the light of this declaration of the law by the Supreme Court that whether the alleged insolvency has or has not been proved (and certainly it has not in this case been proved that the fair value of the assets of the Long Bell Lumber Company do not exceed its liabilities), the fact of insolvency would not give the complainants, as unsecured creditors, any right to the equitable relief they pray.

3. Since this opinion is intended to be supplemental to that filed on the motion to dismiss, I have here discussed only the new matters introduced by amendments to the original bills. It is unnecessary to consider the special defenses presented by the answers and various subordinate issues which have been made.

4. Finally it should be said that, even if there were facts in this record which legally would support the appointment of a receiver for the Long Bell Lumber Company and its subsidiaries, and I have found that there are no such facts, still the decision to appoint a receiver would involve the exercise of sound discretion. How that discretion should be exercised would depend on many things. Whether a receivership, on the one hand, or the continued control of the business by its owners, on the other hand, would best serve the interests of creditors ought seriously to be considered in the exercise of that discretion. In choosing between such alternatives, the chancellor certainly would be influenced by the previous history of the business institution involved. Therein would he seek for evidence of the quality and character of the men who have builded and worked through the institution. Justification there may be and often is for the taking over by a court of a business enterprise, in the interests of its creditors, when those who own it and have managed it have proved unworthy, have exhibited incompetence and dishonesty. It is quite another thing, however, in a case where it appears that men who have developed a business from its beginning, who through years have proved their efficiency and capacity, whose whole careers have been exemplary of justice in their business dealings, of honor and integrity, it is quite another thing to swoop down upon them and to seize their business merely because an unforeseen calamity has involved them in what may be only temporary difficulties. In such

a course there is possibility of intolerable tyranny.

The history of the Long Bell Lumber Company, as the evidence in this case discloses, is inspiring. Long ago was its beginning. In a little town in Kansas one man started it with a carload of second-hand lumber as his stock in trade. One man builded it until it became the greatest institution of its kind in the whole world. For sixty years its reputation and his not only have been unsullied, they have stood out for emulation. This man still is the dominating spirit of the business which he builded. The four score and two years he has lived and labored, marvelous to say, have taken from him nothing of moral or mental power. A world-wide depression which has wrecked even governments and great business enterprises everywhere has brought his company too into a sea of troubles. It may not be possible for the ship to weather the storm, but the captain is not responsible for the storm. He and those who have worked under his direction have done everything it was possible for them to do to make staunch the vessel against the threatening elements, and whatever has been done has had that as its sole object.

### Conclusion.

The conclusion is that under the pleadings and upon the facts the complainants are not entitled to the relief prayed by them, and that the bills should be dismissed.

Formal findings consistent with those generally stated herein and an appropriate form of decree may be submitted.